METCALF CONSTRUCTION COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Lend Lease Actus, Intervenor.

No. 02–55C.

United States Court of Federal Claims.

Filed Under Seal: July 2, 2002.

Published: Sept. 24, 2002.[1]

1. This opinion was originally issued and filed under seal on July 2, 2002 pursuant to this court's January 25, 2002 protective order. The parties were granted an opportunity (by order dated July 2, 2002) to advise the court of any portions of this opinion that should be redacted prior to publication. Plaintiff filed a timely reply representing that all parties had agreed upon the recommended redactions filed by it on July 16, 2002. Upon careful review, the court has incorporated some of the redactions suggested by the parties, while finding that others included language that either was not "protected information" and/or was otherwise fundamental to the court's decision. Those redactions occurring herein have been indicated by ellipses within brackets ([...]). All pages of the appendices have been excised.

A few minor (editing) changes (*i.e.*, adding the name of the intervenor to first page, adding this footnote, adjusting footnote references) have been made to this opinion, none having any affect whatever on the decision herein.

Robert J. Symon, Washington, D.C., attorney of record for plaintiff.

Virginia M. Lum, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

Stephen D. Tom, Honolulu, Hawaii, attorney of record for intervenor.

*OPINION*

REGINALD W. GIBSON, Senior Judge.

**INTRODUCTION**

*Procedural Posture*

This post-award bid protest case is before the court on cross-motions for summary judgment based upon the administrative record.[2] The U.S. Court of Federal Claims has jurisdiction to hear post-award bid protest cases pursuant to 28 U.S.C. § 1491(b). At the time plaintiff Metcalf filed its initial motions and complaint,[3] the defendant had previously agreed to defer issuance of a Notice to Proceed with performance of the contract until April 26, 2002. A status hearing on plaintiff's initial filings was held on January 23, 2002, whereby the court adopted the parties' jointly proposed schedule for the briefing of dispositive motions and oral argument. Additionally, the court sanctioned defendant's modified agreement to abstain from issuing a Notice to Proceed with performance by the awardee of the contract in this case until April 26, 2002, or the date the court issues its decision on the merits, whichever is later, thereby obviating the need for a temporary restraining order.[4]

Consistent with the agreed upon procedural schedule, defendant filed the administrative record with this court on February 5, 2002, and following thereon both parties filed their respective dispositive motions, pursuant to RCFC 56.1, on February 26, 2002. A motion to intervene as a defendant was filed by the awardee, Lend Lease Actus ("LLA"), on February 27, 2002, and was granted on March 14, 2002. Reply briefs were filed on March 14, 2002, and oral argument on subject motions was heard on April 16, 2002.

*Factual Background*

Plaintiff Metcalf is a small, Historically Underutilized Business Zone ("HUBZone") contractor,[5] and defendant is the U.S. Department of the Navy ("Navy"). On or about April 5, 2001, defendant issued Request for Proposal No. N62742–00–R–1345 ("RFP" or "Solicitation") for the design and construction of military housing at the Marine Corps Base in Kaneohe Bay, Hawaii.[6] The RFP called for the design and construction of 30 military family housing units beginning in the fiscal year ("FY") 2001, which is referred to as the Base Item or Item 0001. Two construction options were also provided for in the RFP, to wit, Option 0001, exercisable within 180 days of contract award for the construction of 158 additional units in FY 2002, and Option 0002 was exercisable within 545 days of contract award, and provided for the construction of another 24 units in FY 2003.

On or about May 24, 2001,[7] three offerors submitted initial proposals in response to the RFP. Those offerors were Lend Lease Actus ("LLA"), Metcalf Construction Company, Inc. ("Metcalf"), and an Unnamed Corporation.[8] The Base Item of the contract was ultimately awarded to LLA, on September 28, 2001, subject to the exercise of Options

2. Pursuant to RCFC 56.1, Review of Decision on the Basis of Administrative Record.

3. On January 18, 2002, Metcalf filed a motion in this court for preliminary injunction, and a complaint for preliminary injunction, permanent injunction and declaratory judgment seeking to enjoin the Navy from proceeding with performance under the contract award to Lend Lease Actus (the awardee) pending a final determination on the merits by this court. Concurrently, plaintiff also filed in this court motions for a protective order and for leave to file under seal.

4. The court granted plaintiff's motions for a protective order and for leave to file under seal.

5. Duly certified by the U.S. Small Business Administration.

6. Defendant Navy also issued a total of ten (10) amendments to the RFP between April 13, 2001 and September 11, 2001.

7. By the aforesaid time, there had been seven (7) amendments issued to the solicitation.

8. The third Corporation will not be named herein for confidentiality reasons, and henceforth will be referred to as "Unnamed Corp." Of the three offerors, Metcalf is the only HUBZone contractor.

0001 and 0002 by defendant to the benefit of the awardee. Upon notice of the award to LLA, Metcalf immediately requested a debriefing, which was held on October 2, 2001. During the debriefing, Metcalf learned that it had been eliminated from the competition solely because it had exceeded the alleged "budget ceiling" for Option 0002 in Section 1A.7 of the Solicitation.

Acting upon the discovery that it had been *eliminated from award consideration,* Metcalf filed a protest on October 5, 2001 with the U.S. General Accounting Office ("GAO"), forthwith, contending, *inter alia,* that Section 1A.7 of the Solicitation was "ambiguous at best" and that the Navy had no reasonable basis for eliminating it from award consideration. The GAO found in favor of the Navy, and thereby denied Metcalf's protest on or about January 14, 2002. Shortly thereafter, Metcalf duly invoked this court's jurisdiction to hear its post-award bid protest claim by filing its complaint on January 18, 2002.

In both its complaint and subsequent RCFC 56.1 motion, Metcalf raised and averred a six (6)-count argument against the Navy's conduct of the subject solicitation as follows:

COUNT I: Section 1A.7 Ambiguity Renders The Solicitation Defective

COUNT II: Bidders Were Treated Unequally

COUNT III: The SSB Improperly Downgraded Metcalf's Rating For Factor C: Small Business Utilization

COUNT IV: The Navy Employed An Unstated Evaluation Scheme And Failed To Conduct A Best Value Analysis

COUNT V: Elimination Of Metcalf Under The Circumstances Was Unreasonable

COUNT VI: The Navy Failed To Properly Apply The HUBZone Evaluation Preference.

Plaintiff also seeks permanent injunction and a declaratory judgment. In its cross-motion, the defendant, correspondingly and categorically, opposes each of plaintiff's Counts. It further denies any right of plaintiff to injunctive and/or declaratory relief.

*Disposition*

Having addressed each of the six Counts below, *seriatim,* whereupon the court considered all briefs and papers filed by the parties, oral arguments, and all record evidence including the entire administrative record, the court has found with respect to each Count as follows:

(I) Section 1A.7 is *patently* ambiguous rendering the solicitation defective. Plaintiff's duty to inquire was negated by defendant's duty, on this record, to notify; the failure of which prejudiced the plaintiff. The Navy, thereby, failed to act in accordance with law.

(II) The Bidders were treated unequally, thus unfairly, when one bidder received *unequivocal* clarification regarding the "budget ceilings" and the other bidders did not, constituting arbitrariness and acts by defendant not in accordance with law.

(III) Although the Navy improperly evaluated plaintiff's overall rating for Factor C: Small Business Utilization due to its "NR" rating in subfactor 1, the result was harmless error.

(IV) The Navy acted arbitrarily when it ranked plaintiff third technically, as said ranking is not supported in the record.

(V) The Navy acted arbitrarily, and otherwise not in accordance with law, when it eliminated Metcalf for exceeding a line-item budget ceiling, but did not eliminate another bidder who had previously committed the identical error.

(VI) The Navy properly applied the 10% HUBZone preference for price evaluations, in accordance with law.

Based upon all of the foregoing, and as discussed in detail below, the court hereby:

(1) Grants plaintiff's motion for summary judgment as to Counts I, II, IV and V, and denies plaintiff's motion as to Counts III and VI;

(2) Denies defendant's motion for judgment as to Counts I, II, IV and V, and grants defendant's motion as to Counts III and VI;

(3) Grants plaintiff's motion for permanent injunction and declaratory judgment; and

(4) Awards plaintiff its costs.

**STANDARD OF REVIEW**

*Administrative Record*

Actions brought under the court's bid protest jurisdiction must be reviewed pursuant to the standards set forth in the APA, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 341 (1997). An agency's decision, therefore, is to be set aside *only* if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In making these determinations, a reviewing court is to assess whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). While "this inquiry into the facts is to be searching and careful, the ultimate standard of review is [ ] narrow." *Id.* That is to say, the court's review of the agency's action is, generally, limited to the administrative record.[9] *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Where an agency's decision is found to be reasonable, a court may not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. But where the agency's finding cannot be sustained on the administrative record, the agency's decision must be set aside. *See* 5 U.S.C. § 706(2)(A). Because it is well-settled that procurement officials are entitled to broad discretion in the evaluation of bids and in the application of procurement regulations, the plaintiff bears a heavy burden of showing, by clear and convincing evidence, either that (1) the agency's decision-making process lacked a rational or reasonable basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Day & Zimmermann Services, A Division of Day & Zimmermann, Inc. v. United States,* 38 Fed.Cl. 591, 597 (1997) (citations omitted).

Additionally, minor errors or irregularities, *i.e.,* harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision. *Id.* (citing 5 U.S.C. § 706(2)) (court must take into account the rule of prejudicial error). In order to establish a prejudicial error, a protestor is not required to show that but for the alleged error, the protestor would have been awarded the contract. *Id.* (citations omitted). Instead, a protestor must only show that, had it not been for the alleged error, there was a reasonable likelihood that it would have been awarded the contract. *Id.* (citations omitted).

*Summary Judgment*

This court treats motions for summary judgment based upon the administrative record under RCFC 56.1, the same as motions for summary judgment pursuant to RCFC 56. *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd* 113 F.3d 1255 (Fed.Cir. 1997). Summary judgment is proper when there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Substantive law identifies which facts are material; such that, only those operative facts that could affect the outcome of a suit can properly preclude summary judgment. *Id.* at 248, 106 S.Ct. 2505.

It is well established in this court that a motion for judgment based upon the administrative record "is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are [usually] matters of contractual and regulatory interpretation."[10] Therefore, the court may only grant summary judgment upon its circumscribed re-

9. However, under certain circumstances, a court may deem it to be appropriate to embellish the record by permitting the parties to adduce additional evidence from the stand in open court. *See Cubic,* 37 Fed.Cl. at 342; RCFC 56.1.

10. *Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 319 (2000) (citing *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997) (citations omitted); *Chas. H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 719 (1999)).

view under the APA, *supra*, if no genuine issues of material fact are present, and the movant is entitled to summary judgment as a matter of law.

**SOLICITATION EVALUATION OVERVIEW**

*Source Selection Plan*

The method employed by the Navy to evaluate and select a successful contractor was set forth in the Source Selection Plan ("SSP").[11] Four levels of evaluation authorities were outlined in the SSP as follows: Contracting Officer ("CO"), Technical Evaluation Board ("TEB"), Source Selection Board ("SSB"), and Source Selection Authority ("SSA"). Those respective authorities were charged with the following functions:

(1) *Contracting Officer* (CO)—Check proposals for conformance to the RFP and review for any qualifying items. Any qualifying item found in the proposal shall be brought to the attention of the SSA who will be informed of the intended action to be taken.

(2) *Technical Evaluation Board* (TEB)—Members: Identify specific deficiencies in each proposal. Prepare concise questions to offerors in order to point out deficiencies in the proposal. If discussions with offerors are necessary, re-evaluate and rate each proposal as a result of any revisions to proposals after discussions. Chairperson: Participates in discussions as directed by the SSB Chairperson. Directs preparation of final TEB narrative to support ratings assigned to offerors by identifying specific strengths and weaknesses of each proposal. Prepares and presents oral briefing to the SSB justifying assigned ratings.

(3) *Source Selection Board* (SSB)—Develops Source Selection Plan and provides guidance and detailed instruction to the TEB. Reviews proposals and validates ratings assigned by the TEB. Determines whether additional information is to be obtained from offerors to permit adequate evaluation of proposals. Conducts discussions/negotiations as necessary. Prepares a report and recommends to the SSA which proposals should be included in the competitive range or the successful offeror.

(4) *Source Selection Authority* (SSA)—Approves Source Selection Plan. Oversees propriety of source selection process. Authorizes discussions if discussions are found to be necessary. Either accepts or rejects recommendations of the SSB. Selects most advantageous proposal to the Government considering price and other factors with the advice of the SSB.

*Pertinent sections of the RFP*

Following are pertinent sections of the Solicitation describing the Navy's overall objective and manner of conduct:

- The Government intends to award a contract or contracts resulting from this solicitation to the responsible offeror(s) whose proposal(s) represent(s) the best value after evaluation in accordance with the factors and subfactors in the solicitation. (Paragraph 1A.5(f)(1)).
- The Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. (Paragraph 1A.5(f)(4)).
- The contract resulting from this solicitation will be awarded to that responsible offeror whose offer, conforming to the solicitation, is determined to be the most advantageous to the Government considering "Price" and "Technical" evaluation factors. Award may be made to other than the lowest price offeror or other than the highest technically rated offeror. The "Technical" evaluation factors are considered approximately equal to "Price." (Paragraph 1B.1).
- Except when it is determined in accordance with FAR 17.206(b) not to be in the Government's best interests, the Government will evaluate offers for award purposes by adding the total price

11. The SSP was a document internal to the Navy, and was not included in the RFP.

for all options to the total price for the basic requirement. Evaluation of options will not obligate the Government to exercise the option(s). (Paragraph 1B.2).

- Price proposals will be evaluated in accordance with FAR 52.217–5, Evaluations of Options. For evaluation purposes, the price for pre-priced Options 0001 and 0002 will be added to the Item 0001 price. Upon addition of Item 0001, Option 0001 and Option 0002 prices, prices will be evaluated in accordance with FAR 52.219–4, Notice of Price Evaluation Preference for HUBZone Small Business concerns. The Offeror's price will be evaluated and compared against its relative technical quality of its proposal.[12] (Paragraph 1B.8).
- TECHNICAL EVALUATION FACTORS. The following evaluation factors and subfactors shall be used to evaluate the technical proposals.

Factor A: PAST PERFORMANCE (Subfactors are of equal importance)

(1) Construction Contractor's Past Performance in Similar Type Facilities

(2) Designer's Past Performance

(3) Contractor's Past Performance (did not meet customer satisfaction)

Factor B: QUALIFICATIONS AND EXPERIENCE (Subfactors are in descending order of importance)

(1) Construction Contractor's Qualifications and Experience

(2) Designer's Qualifications and Experience

Factor C: SMALL BUSINESS UTILIZATION (Subfactors are of equal importance)

(1) Past Performance in Utilization of Small Business Concerns

(2) Participation of Small Business Concerns in this project

Factor D: TECHNICAL APPROACH

(1) Building Design

Factor E: MANAGEMENT PLANS (Subfactors are of equal importance)

(1) Design/Build Management Plan

(2) Project Schedule

(Paragraph 1B.4).

- TECHNICAL EVALUATION RATING SCHEME. The following technical rating scheme shall be used in evaluation of each technical evaluation factor as well as the overall rating of each offeror's technical proposal. In accordance with the maximum quality criteria set forth in this manual, the TEB will assign the following: HIGHLY ACCEPTABLE (HA), ACCEPTABLE (A), MARGINAL (M), and UNACCEPTABLE (U). (Paragraph 1B.5).
- The Government intends to evaluate all proposals received and award a contract without discussions. However, if discussions are deemed necessary, to maximize the Government's ability to obtain the best value, discussions will be held with those offerors within the competitive range. The Government may limit the number of proposals in the competitive range to the most highly qualified proposals, considering price and technical factors. (Paragraph 1B.6).
- Any proposal may be found unacceptable and ineligible for consideration if the proposer does not comply with the requirements of this RFP. Failure to comply with technical features, cost limitation, acknowledgment of amendments and submittal of the required bid guarantee are common causes for finding proposals unacceptable. (Paragraph 1C.7).

**COUNT I:** Section 1A.7 Ambiguity Renders The Solicitation Defective

A. *Facts*[13]

The dispute in this issue arises from the interpretive meaning of paragraph 1A.7 of

12. Amendment No. 0004, issued on or about May 4, 2001, deleted the then existing paragraph and inserted the foregoing paragraph in its entirety (save Amendment 0008). AR at 24–34. Subsequently, Amendment No. 0008, issued on or about August 8, 2001, replaced the word "award" for the word "evaluation" in the second sentence of the paragraph. AR at 162–182.

13. For purposes of continuity, the facts recounted here encompass the full chronology of events giving rise to all of the claims in this case.

the RFP ("Section 1A.7") which states in its entirety:[14]

"Paragraph 1A.7 **INFORMATION CONCERNING COST LIMITATIONS:**

The budget ceiling for the award of this contract is as follows:

Base Item: $7,300,000 for Project H–570 (30 units)

Option 0001: $35,780,000 for Project H–571 (158 units)

Option 0002: $5,400,000 for Projects H–571 and H–563 (24 units).

Proposals in excess of this amount will *not* be considered. Offerors should prepare their proposals so as to permit award at a price within the cost limitation."

AR at 805 (emphasis in original).

Over the course of the evaluation period under the subject RFP, proposals were submitted a total of four (4) times by the offerors. Prior to the initial submission of proposals, the Navy issued three (3) successive Notices entitled "Pre–Proposal Questions & Answers" containing pre-proposal questions raised by the prospective offerors fitted with answers provided by the Navy.[15] Unnamed Corp. submitted a letter dated May 17, 2001, posing the following pre-proposal question:

"1. **1A.7 pg 1A–5 Cost Limitation**

Based on our experience and current pricing of this project, the overall budget projects to be 'tight' but perhaps adequate. However, we wish to point out that the 'break down' by bid item is somewhat skewed. We are forecasting that the cost for the Base Bid is about [. . .], while Option 1 is about [. . .]. The budget for Option–2 appears to be sufficient at this time. Please advise."

AR at 2877 (emphasis in original).

A truncated version of Unnamed Corp.'s foregoing question appeared as question number 36 in Notice No. 3, published on or about May 22, 2001, joined with the Navy's given answer:

"Q36: The budget for the Base Bid item appears short, while Option 0001 appears long. Please advise.

Answer: The budgets for the base bid and all options are considered adequate given the number of units to be constructed within each project."

AR at 2808.

Thereafter, on or about May 24, 2001, three offerors submitted their respective initial bids inclusive of price proposals. In its subsequent June 4, 2001 price analysis report, the Contract Specialist[16] ("CS") noted that Unnamed Corp. exceeded the "budget ceilings" for the Base Item and Option 0002. (*See* App. B, page 1 of 2, Rpt. of June 4, 2001). Plaintiff and Intervenor, LLA, however, submitted bids within those "ceilings." Upon evaluating the offerors' technical submissions, the TEB issued a June 13, 2001 report, rating *each* of the three offers technically [. . .], *i.e.*, [. . .]. (*See* App. A, page 1 of 4, Rpt. of June 13, 2001). Consequently, the Navy exercised its discretion (pursuant to paragraph 1A.5(f)(4) of the solicitation) to hold discussions with the offerors. Discussion questions were sent to all bidders on or about August 8, 2001.

All three offerors submitted revised proposals on or before the August 15, 2001 deadline. Upon evaluation of the revised proposals by the TEB, LLA and Unnamed Corp. received [. . .] overall technical rating, while Metcalf still received a "Marginal" overall technical rating. (App. A, page 2 of 4, Rpt. of Aug. 22, 2001). The CS also prepared another price evaluation report finding that each of the offerors' prices were within the stated "budget ceilings," as Unnamed Corp. had adjusted its prices accord-

Hereinafter, additional facts pertinent to the successive Counts will be referenced appropriately.

**14.** As revised by Amendment No. 0007, on or about May 21, 2001, which deleted the word "may" and inserted the word "will" in line 6 of this paragraph. AR at 39.

**15.** *Notice No. 1,* dated April 27, 2001, contained questions and answers numbered 1–19 (AR at 2811–2815); *Notice No. 2,* dated May 10, 2001, contained questions and answers numbered 20–32 (AR at 2808–2810); and *Notice No. 3,* dated May 22, 2001, contained questions and answers numbered 33–37 (AR at 2806–2807).

**16.** The Contract Specialist is a member of the Contracting Officer's staff. AR at 838.

ingly. (App. B, page 1 of 2, Rpt. of Aug. 16, 2001).

On or about September 6, 2001, the Navy issued a request for "Final Proposal Revisions" to all offerors (Amendment 0009). Included with the request sent to Metcalf were additional discussion questions regarding remaining technical weakness in its proposal. Soon thereafter, all offerors submitted timely final proposal revisions (on or before September 10, 2001). The TEB subsequently issued an amended technical evaluation report, where Metcalf therein received an overall "Acceptable" rating, although the TEB ranked Metcalf third technically. (App. A, page 3 of 4, Rpt. of Sept. 10, 2001). A third price evaluation found all prices unchanged with the exception of Unnamed Corp., having [...] its price on Option 0001. (App. B, page 2 of 2, Rpt. of Sept. 10, 2001).

Subsequently, on September 11, 2001, the Navy advised the offerors of a U.S. Department of Labor modification to the applicable Davis Bacon Act wages which required the Navy to issue a second request for final proposal revisions (Amendment 0010), to be remitted by September 13, 2001. All (price) proposal revisions were timely remitted, none having technical revisions. Metcalf, however, exceeded the $5,400,000 "budget ceiling" for Option 0002 by [...], which was noted by the CS, but no recommendation was made to eliminate Metcalf. (App. B, page 2 of 2, Rpt. of Sept. 13, 2001).

The SSB convened to review the second final revised price analysis submitted by the Contract Specialist on or about September 13, 2001, and the amended technical evaluation reports submitted by the TEB on or about August 23, 2001 and September 10, 2001. The SSB issued its report to the SSA on or about September 24, 2001, which included the following recommendations: (1) Metcalf's Factor C rating was to be adjusted from a "Highly Acceptable" to "Acceptable," (2) Metcalf was to be eliminated from the competition for exceeding the line-item budget for Option 0002, and (3) the contract award was to go to LLA. AR at 738–752. The SSA summarily approved the recommendations of the SSB on or about September 25, 2001. AR at 752.

On September 28, 2001, Metcalf was notified in writing of the contract award to LLA. On the same date, Metcalf submitted a letter to the Navy requesting a debriefing. On October 2, 2001, Metcalf was debriefed, and during said debriefing learned for the first time that its proposal was not considered for award because its price proposed for Option 0002 exceeded the (alleged) line-item budget ceiling. On October 5, 2001, Metcalf filed a post-award bid protest with the General Accounting Office ("GAO") contending, among other things, that Section 1A.7 of the solicitation was "ambiguous at best," and that the Navy had no reasonable basis for eliminating it from award consideration. Between October 12, 2001 and December 6, 2001, the Navy, Metcalf, and LLA submitted to the GAO their respective written claims, arguments and replies thereto. On January 14, 2002, the GAO issued a decision denying Metcalf's protest.[17] AR at 2879–2884.

B. *Contentions of the Parties*

1. Plaintiff

Relying on the general "plain language" rule of contract interpretation, Metcalf asserts that it reasonably interpreted the language of Section 1A.7 to require elimination of an offeror whose proposal price exceeded the "budget ceiling" for the project, with the phrase "budget ceiling" meaning the sum of the Base Item and both Options, *i.e.*, a total of $48,480,000.[18] Pl.Mem. at 7. Metcalf bases

17. Although this court is not bound by GAO decisions, some deference is generally accorded to the oversight agency. *E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123, 134 (1995), *aff'd,* 77 F.3d 445 (Fed.Cir.1996). In the instant matter, however, the court has not deferred to the GAO's decision because (1) the required contract interpretation issue is a question of law for the court to decide, and (2) the GAO's finding in favor of the Navy is unsupported on this record.

18. Plaintiff showed that the Source Selection Plan (SSP), itself, made reference to the "budget ceiling" amount of $48,480,000. AR at 86. Notwithstanding, the court is aware that this and other information in the SSP, was not available to the offerors during the bidding process, but was later revealed through release/discovery of the administrative record.

its interpretation upon the "plain language" used in Section 1A.7, to wit, "budget ceiling," "this amount," and "cost limitation." Pl. Mem. at 7–8. Plaintiff points out that there is no dispute that the phrase "budget ceiling," and the other pertinent language in Section 1A.7, is singular in form, which reasonably implies that elimination for exceeding the budget ceiling relates to a single price for the total project. Pl.Mem. at 8. Otherwise, if the phrase "budget ceiling" was to apply to each separate line item, Section 1A.7 should have read: "Proposals in excess of [these amounts] will *not* be considered." *Id.*

Metcalf proffers that the plain language of Section 1A.7 alone supports the reasonableness of its interpretation. Pl.Mem. at 9. Additionally, it argues that its position is further bolstered by "compelling evidence" found in the June 4, 2001 price analysis report conducted by the Navy's Contract Specialist, where the CS said of Unnamed Corp.'s initial price proposal:

> "It is noted that [Unnamed Corp.'s] prices for Line Items 0001 and 0003 exceeded the stated budget ceilings for those specific Line Items. As stated above, paragraph 1A.7—Information Concerning Cost Limitations, was amended to read as follows: 'Proposals in excess of this amount *will* not be considered.' [sic] which would basically eliminate [Unnamed Corp.'s] proposal as non-conforming. However, paragraph 1B.8 states in pertinent part, 'For *award* purposes, the price for pre-priced Options 0001 and 0002 will be added to the Item 0001 price.' ***This could be construed as a 'total' budget ceiling vice an individual line item budget ceiling,*** therefore, it is recommended that [Unnamed Corp.'s] price be evaluated along with the other two offers at this time. Based on the TEB's evaluation, if discussions are indicated, it is recommended that [Unnamed Corp.'s] proposal be kept within the competitive range as its price for each line item is not considered excessive. Item 0001's price is [. . .] higher than the budget ceiling and Option 0002's price is [. . .] higher than the budget ceiling."

Pl.Mem. at 9–10 (citing AR at 157) (emphasis added). *See also* App. B, page 1 of 2, Rpt. of June 4, 2001.

Plaintiff maintains that the foregoing comments of the CS have the two-fold effect of showing that: (1) Unnamed Corp. shared the same interpretation as plaintiff, and (2) the Navy's own CS agreed that Section 1A.7 was subject to more than one reasonable interpretation. Pl.Mem. at 10. Furthermore, avers plaintiff, while the GAO strained its analysis to find in favor of the Navy's interpretation, it, too, acknowledged that the language in Section 1A.7 was "somewhat confusing."[19] Pl.Mem. at 12 (citing AR at 2882). Lastly, plaintiff points to several instances in the administrative record where both the GAO and the Navy, when addressing the Section 1A.7 issue, themselves, used the plural phrase "budget ceilings," rather than the singular phrase "budget ceiling," as was used in the solicitation. Pl.Mem at 12–13 (citing AR at 157, 749–750, 2828, 2837[, 2882, 2883]).

Plaintiff's written arguments conclude that "the Navy drafted the key language of Section 1A.7 in the *singular* creating an ambiguity at best, which under the doctrine of [*contra proferentem*], is construed against the Navy." Pl.Mem. at 13 (citing *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390 (1947)).[20]

2. Defendant

Defendant counters by citing to the familiar rule of contract interpretation which states: "When interpreting the language of a

19. The court notes that at page 4 of the GAO's January 14, 2002 Decision, it wrote: "While we recognize that the language of section 1A.7 is *somewhat confusing,* we nonetheless think that the provision is susceptible of only *one reasonable interpretation*...." AR at 2882 (emphasis added).

20. At oral argument, however, plaintiff asserted the following position respecting the Section 1A.7 ambiguity issue: "MR. SYMON: My position is that the solicitation is clear and unambiguous regarding the application of a budget ceiling relating to one amount." Oral Argument Tr. at 53:1–3 (Apr. 16, 2002), *Metcalf Constr. Co., Inc. v. U.S.,* Fed.Cl. No. 02–55C, 2002 WL 221470 (Jan. 18, 2002).

contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless." Def. Reply at 4 (citing *Fortec Constructors v. United States,* 760 F.2d 1288, 1291–92 (Fed. Cir.1985)). Given the foregoing, the Navy challenges plaintiff's argument—that the singular terms "budget ceiling," "this amount," and "cost limitation" establish that elimination for exceeding the budget ceiling related to a single price of $48,480,000—does not give reasonable meaning to all parts of the contract.[21] Def. Reply at 4.

The Navy instructs that even the title of Section 1A.7—"INFORMATION CONCERNING COST LIMITATIONS," clearly alerts the offerors that multiple cost limitations are required. Def. Motion at 14. Metcalf's interpretation, therefore, renders meaningless both the title and express provision of Section 1A.7. *Id.* Defendant contends that:

> "[T]he plain terms of section 1A.7 clearly list three separate line items for three separately specified unit builds (30 units, 158 units, and 24 units); three separately-named projects (H–570, H–571, H–571 with H–563); three separate options (base item, option 0001, and option 0002); and three separate budget ceilings for each of the three separately priced options ($7,300,000, $35,780,000, [and] $5,400,000)."

Def. Reply at 4–5. In so doing, "[t]he Navy purposely and clearly listed three distinct and separate cost limitations because each line item was to be awarded or exercised separately. Only the base item project was to be awarded at contract award." Def. Motion at 13–14. Hence, avers the Navy, its interpretation of Section 1A.7 gives the only reasonable meaning to all parts of the solicitation. Def. Motion at 14.

As for plaintiff's reliance on Unnamed Corp.'s initial price proposal (which exceeded two of the alleged line-item "budget ceilings") to show that another bidder shared its interpretation, defendant scoffs that plaintiff's "speculation" is "unfounded," "specious" and "meaningless." Def. Motion at 17. Defendant avers that the record contains no statement from Unnamed Corp. interpreting the clause, and that the reason for Unnamed Corp.'s non-compliant submission is unknown. Def. Motion at 17–18. The Navy (paradoxically) addresses the *Contract Specialist's* June 4, 2001 comments by: (1) labeling the *plaintiff* as being "confused," and (2) averring that Section 1A.7 "must be read as distinct from" Section 1B.8. Def. Motion at 16–17. Finally, defendant surmises that its interpretation of Section 1A.7 is the only meaning that would be derived by a "reasonably intelligent person acquainted with the contemporaneous circumstances," and therefore should be upheld. Def. Motion at 18–19 (citing *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 386, 351 F.2d 972, 974 (1965)).

C. *Analysis*

Count I unmistakably raises a contract interpretation issue, which is a question of law to be decided by the court. *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984). Well established rules of contract interpretation are therefore apposite. First, "an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). Second, the words of a contract "are to be given their plain and ordinary meanings." *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). Third, the plain and ordinary meaning given to the language of a contract must produce an interpretation that would be derived "by a reasonably intelligent person acquainted with the contemporary circumstances." *Rice Lake Contracting, Inc. v. United States,* 33 Fed.Cl. 144, 152 (1995) (citing *Firestone Tire & Rubber Co. v. U.S.,* 195 Ct.Cl. 21, 30, 444 F.2d 547 (1971)).

Additional rules apply, as here, where the contract language at issue is said to be ambiguous. Ambiguity arises when some

21. Defendant informs the court that plaintiff's alleged totaled budget ceiling amount of $48,480,000 is not mentioned anywhere in the RFP. Def. Reply at 6. Furthermore, Section 1A.7 does not refer to a "total" or "combined cost" nor does it mention the word "addition." Def. Motion at 13.

portion of the contract "is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993). In its analysis, a court must first determine whether ambiguity exists; then, if it does, whether it is latent or patent.

An ambiguity is latent where it is subtle, or otherwise undetectable, until such time as the parties reasonably ascribe two different meanings.[22] When there is a latent ambiguity, the rule of *contra proferentem* "puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; ... and it saves contractors from hidden traps not of their own making." *Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970). Hence, if contract language "is ambiguous and the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government." *United Pac. Ins. Co. v. United States,* 204 Ct.Cl. 686, 695, 497 F.2d 1402, 1407 (1974).

On the other hand, a patent ambiguity is one that is "obvious," "gross," "glaring," or "substantial." *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir. 1996). Under the patent ambiguity doctrine, if the ambiguity is so patent or glaring, there arises in the contractor a duty to inquire, notwithstanding the reasonableness of its interpretation. *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1474 (Fed.Cir.1997). "The duty requires the contractor to inquire [as to] the correct meaning of the contract prior to submitting a bid. If a contractor fails to conduct such an inquiry, a patent ambiguity in a contract will be resolved against the contractor." *Nielsen–Dillingham Builders, J.V. v. United States,* 43 Fed.Cl. 5, 10 (1999) (citations omitted). An exception to a plaintiff's duty to inquire exists when the defendant has notice of the ambiguity or defect, and either fails to notify all bidders, or otherwise fails to clarify the flaw. *See Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1374–75 (Fed.Cir.2002); *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874 (1963).

Here at bar, we begin by rejecting defendant's inclusion of the section title, "INFORMATION CONCERNING COST LIMITATIONS," as part of the text to be interpreted by this court. It is obvious to the court that defendant is applying the well-known rule of statutory interpretation that: "For interpretative purposes, [section headings and titles] are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt." *Brotherhood of Railroad Trainmen v. B. & O. Railroad Co.,* 331 U.S. 519, 529, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). Unquestionably that rule can be a useful one, albeit not here. For instance, the plural form of the phrase "cost limitations," in the title, does nothing to "shed light" on the singular form of the phrase "budget ceiling," in the text. In fact, the only affect that the section title can possibly have on interpreting the text before us is to exacerbate the existing ambiguity or "doubt." The court must decline the defendant's invitation.

Having said that, in our endeavor to give the language of the contract its "plain and ordinary meaning," and at the same time give "a reasonable meaning to all parts of the contract," we find the comments of the CS to be probative. While the defendant blames the *plaintiff* for confusingly reading Sections 1A.7 and 1B.8 together, it was the Navy's own contract personnel who *sua sponte* informed the Navy that: "[P]aragraph 1B.8 states in pertinent part, 'For *award* purposes, the price for pre-priced Options 0001 and 0002 will be added to the Item 0001 price.' *This could be construed as a 'total' budget ceiling vice an individual line item budget ceiling....* " AR at 157.

Under these ripe circumstances, it would be safe to assume that the Contract Specialist *is* "a reasonably intelligent person acquainted with the contemporary circumstances." *Rice Lake,* 33 Fed.Cl. at 152. Therefore, if the Contract Specialist identi-

22. *See Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997); *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed. Cir.1993).

fied an inconsistency in the contract language that could reasonably be construed contrary to the defendant's interpretation, then the concept of *res ipsa loquitur,* by analogy, concludes our analysis. What is utterly perplexing to this court is the fact that the GAO found that: "While [it] recognize[s] that the language of section 1A.7 is *somewhat confusing,* [it] nonetheless think[s] that the provision is susceptible of only *one reasonable interpretation....* "[23] To so conclude, in this court's view, strains credulity.

"[A] contract is subject to a patent ambiguity if it contains facially inconsistent provisions that would place the reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Nielsen–Dillingham,* 43 Fed.Cl. at 11. In addition to the above statements by the CS, the bare fact is that Section 1A.7 has three (3) separately stated cost line-items, albeit they are nowhere totaled in the RFP, but are expressly referred to by the singular language: "budget ceiling," "this amount," and "cost limitation." On its face, the court finds an obvious inconsistency in this contract provision that should "place the reasonable contractor on notice" of a defect; *i.e.,* a patent ambiguity. Plaintiff, therefore, had a duty to inquire or seek clarification prior to submitting its bid, and not rely on its own interpretation. Metcalf, however, failed to seek clarification, but instead relied on its own interpretation which could be resolved to its detriment.

The court's inquiry now turns to whether the exception to the patent ambiguity doctrine applies; that is, whether defendant had notice of the defect, and if so, whether it had a duty to notify all bidders. In *Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1374–75, the Federal Circuit Court examined what gives rise to the government's duty to notify pursuant to section 14.208(c) of the FAR which provides:

> "(c) Any information given to a prospective bidder concerning an invitation for bids shall be furnished promptly to all other prospective bidders as an amendment to the invitation (1) if such information is necessary for bidders to submit bids or (2) if the lack of such information would be prejudicial to uninformed bidders. The information shall be furnished even though a pre-bid conference is held. No award shall be made on the invitation unless such amendment has been issued in sufficient time to permit all prospective bidders to consider such information in submitting or modifying their bids."

Because the Circuit Court had not previously interpreted section 14.208(c), it looked to the interpretation offered by the Board of Contract Appeals given to the regulation that proceeded section 14.208(c).[24] *Hunt Constr.,* 281 F.3d at 1374–75. The *Hunt Constr.* Court analyzed two Board decisions: *Peter Kiewit and Sons' Co.,* ASBCA No. 17,709, 74–2 BCA ¶ 10,975, 1974 WL 1615 (1974); and *Price/CIRI Constr., J.V.,* ASBCA No. 37,002, 89–3 BCA ¶ 22,059, 1989 WL 77273 (1989). The first case, *Peter Kiewit,*[25] was summarized by the Court as follows:

> "[T]he Board found that a government contract for lighting systems contained a patent ambiguity. The Board recognized

23. AR at 2882 (emphasis added).

24. The predecessor of FAR § 14.208(c) was codified in the Armed Services Procurement Regulations ("ASPR") § 2–208(c) (1974). *Hunt Constr.,* 281 F.3d at 1374–75.

25. In *Peter Kiewit,* the contract under performance was for the construction of a building when there arose a question as to whether a lighting system for the exterior of the building was provided for in the solicitation plans. The petitioner maintained that it was not; but the Government answered that it issued an addendum which was to eliminate any discrepancy as to the required lighting system. The review Board found that there was a patent ambiguity in the plans pertaining to the lighting system, and that the petitioner had a duty to inquire about it. That would have been the end of the Board's analysis, in favor to the Government, but for the fact that another bidder had previously inquired about the same discrepancy. During the pre-proposal question and answer phase, the other bidder inquired as to the lighting system and was told with specificity how to proceed. The Board found that: "The information given to this one prospective bidder should have been disseminated to all bidders, as required by ASPR 2–208(c)." *Appeal of Peter Kiewit and Sons' Inc.,* ASBCA No. 17,709, 74–2 BCA § 10,975, 1974 WL 1615 (1974).

the well-established rule that a contractor has a duty to seek clarification of a *patent* ambiguity. [ ] But because another bidder asked for clarification of the ambiguity prior to bid award, the Board held that the government had notice of the patent ambiguity and therefore was obligated under ASPR § 2–208(c) to advise *all other bidders* of the ambiguity in the contract. The Board held that '[t]he information given to this one prospective bidder should have been disseminated to all bidders.' The Board excused the contractor's failure to inquire about the patent ambiguity, because the other bidder's inquiry gave the government notice of the ambiguity, thereby obligating the government to clarify that ambiguity to all bidders."

*Hunt Constr.*, 281 F.3d at 1375 (emphasis added) (citations omitted).

The Court made a similar assessment of *Price/CIRI Constr.*,[26] and thereby concluded: "Thus, in both [cases], the Board found that the government had a duty to clarify a patent ambiguity of which it had notice prior to bid award." *Id.* The Court held that "such a duty to notify arises only if the contract is ambiguous." *Id.* In *Hunt Constr.*, however, the Court found that the contract at issue was unambiguous and, therefore, the Board decisions were inapposite in that case. But here at bar, we have found that the contract language *is patently* ambiguous. Additionally, whether notice to the defendant may derive from another bidder raising the same issue and, thereby, prompting a duty to notify all bidders, is precisely the question before this court. Based upon the foregoing analysis by the Circuit Court, the question is clearly answered in the affirmative.

Undeniably, Unnamed Corp.'s pre-proposal question in its May 17, 2001 letter raised the issue of how the budget items were to be construed. Defendant insists that its answer to Unnamed Corp.'s question put all bidders on notice that the separate "budget ceilings" were not to be exceeded, and that Notice No. 3 was made available to all bidders prior to the submission of their initial bids. For that reason, defendant asks us to ignore the fact that, notwithstanding its Notice No. 3, Unnamed Corp.'s initial price proposal still exceeded the alleged *budget ceilings* for both the Base Item and Option 0002 (yet it stayed within the *overall budget*). While defendant focused its answer on the portion of Unnamed Corp.'s question dealing with each budget item, it overlooked the fact that Unnamed Corp. also referred to an "overall budget." This raises another question (which will be addressed below) regarding the effectiveness of defendant's alleged notice when even the bidder asking the question did not comprehend, or otherwise conform to, defendant's answer.

Following Unnamed Corp.'s infraction regarding exceeding the two line-item budget ceilings, defendant expressly stated, in no uncertain terms, that each line-item was considered a separate budget ceiling not to be exceeded, *but it only included that information in its letter to Unnamed Corp. and no other offeror.* As for the other two offerors, they were allegedly informed via Amendment 0008,[27] which replaced the word "award" for

26. In *Price/CIRI Constr.*, there was a patent ambiguity regarding the piping requirement for four unit heaters. The petitioner had a duty to inquire, but failed to do so. Its failure was not fatal, however, "because another potential bidder saw exactly the same problem and wrote to the Government seeking clarification." Evidence was adduced at a second hearing "to the effect that the Government had responded to the clarification request from the other bidder[,] but no addendum or notice was issued to all other prospective bidders." The Board in that case deferred to the holding in *Peter Kiewit*, affirming that: "the contractor should have but did not seek clarification; however, another bidder did so.... The information given to this one prospective bidder should have been disseminated to all bidders, as required by ASPR 2–208(c)." *Price/CIRI Constr., J.V.*, ASBCA No. 37,002, 89–3 BCA ¶ 22,059, 1989 WL 77273 (1989).

27. Amendment 0008 was recommended by the CS (in his June 4, 2001 report) presumably to correct the flaw that infers that the separate line-item amounts "could be construed as a 'total' budget ceiling." AR at 157.

Paragraph 1B.8, as amended, read: "Price proposals will be evaluated in accordance with FAR 52–217–5, Evaluations of Options. For *evaluation* purposes, the price for pre-priced Options 0001 and 0002 will be added to the Item 0001 price. Upon addition of Item 0001, Option 0001 and Option 0002 prices, prices will be evaluated in accordance with FAR 52.219–4, Notice of Price Evaluation Preference for HUBZone

the word "evaluation" in the second sentence in paragraph 1B.8, but nothing more.

If notice to defendant did not occur as a result of Unnamed Corp.'s May 17, 2001 question, it certainly occurred upon evaluation of the initial price proposals when it discovered that Unnamed Corp. had not conformed its prices, such that at that point, "the Government was under the affirmative obligation ... to clarify [to all bidders] the meaning of the contract in definitive fashion before the plaintiff was bound." *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 10, 323 F.2d 874, 879 (1963).

In *WPC Enterprises,* the procurement was for the manufacturing of large generator sets for aircraft. A dispute arose over whether the contractor could purchase five of the component parts from other companies not named on the Government's approved list. It was determined that the contract contained a latent ambiguity which was construed against the Government. In addition, there were subsequent communications between the contracting parties (after contract performance was underway), whereby each party believed it had made its interpretation clear to the other. Ultimately the court held that "the Government was under the affirmative obligation (if it wished its own view to prevail) to clarify the meaning of the contract in definitive fashion before the plaintiff was bound." *WPC Enterprises,* 163 Ct.Cl. at 10, 323 F.2d 874.

The facts in *WPC Enterprises* appear facially different, but they are analogous in several important ways: (1) the risk of the defect lay with the Government; (2) there was an attempt made by the defendant to convey its interpretation; and (3) the Government's failure to adequately clarify its interpretation harmed the plaintiff. Therefore, the rule in that case—once the defendant has a duty to clarify, it must do so clearly and distinctly—applies here. Although defendant did clearly and distinctly instruct Unnamed Corp., it did not go far enough, pursuant to FAR § 14.208(c), to do the same with respect to the other bidders.[28]

The sequence of events described in the present case is indicative not only of the fact that defendant was put on notice, but that it made two unsuccessful attempts to cure the known defect.[29] Here, as was the case in *WPC Enterprises,* "[t]here was a fatal insufficiency in the defendant's effort to communicate to plaintiff that the contract was to be interpreted as the Government understood it.... Since the burden of clarification was the defendant's, it must bear the risk of an insufficient attempt." *Id.* at 10–11, 323 F.2d 874. Defendant Navy cannot point to Notice No. 3, nor Amendment 0008, to absolve it of its duty to notify or clarify, because an "ineffective attempt to put things right does not place the defendant in a better position." *Id.* at 11, 323 F.2d 874. Without sufficient or adequate notice, plaintiff's committed error is attributed to defendant.

"[Though] [p]laintiff was also at fault [for failing to make an inquiry], [ ] the risk of a failure to clarify [once notified of the defect] lay largely upon the Government and could have been averted only by a more sufficient effort than was made." *Id.* at 12, 323 F.2d 874. Had defendant used the same explicit clarity to notify the other bidders as it did in Unnamed Corp.'s letter, this case, in all likelihood, would never have come before this court. Although the ambiguity was patent, the plaintiff's duty to inquire was negated by defendant's duty to clarify, having had notice of the defect, which defendant failed to do sufficiently. *Hunt Constr. Group,* 281 F.3d at 1375. The Navy therefore must bear the burden of the defect. *WPC Enterprises,* 163 Ct.Cl. at 10–11, 323 F.2d 874.

Small Business concerns. The Offeror's price will be evaluated and compared against its relative technical quality of its proposal." (Emphasis added).

28. That is, "[a]ny information given to a prospective bidder concerning an invitation for bids shall be furnished promptly to all other prospective bidders as an amendment.... No award shall be made on the invitation unless such amendment has been issued in sufficient time to permit all prospective bidders to consider such information in submitting or modifying their bids." FAR § 14.208(c).

29. The first attempt was Notice No. 3, on or about May 22, 2001; the second attempt was Amendment 0008, on or about August 8, 2001.

D. *Prejudice*

Unquestionably, the Navy's failure to adequately notify Metcalf prejudiced it. Metcalf more than meets its heavy burden of showing, by clear and convincing evidence, that the procurement procedure employed here involved a clear and prejudicial error. To establish a prejudicial error, Metcalf is not required to show that but for the alleged error, the protestor would have been awarded the contract. Instead, it must only show that, had it not been for the alleged error, there was a reasonable likelihood that it would have been awarded the contract. *Day & Zimmermann*, 38 Fed.Cl. at 597.

It is undisputed that Metcalf was the lowest-cost bidder, and was rated technically "Acceptable." The other two offerors were [. . .]. Had Metcalf not been eliminated from the competitive range, defendant would have had to have conducted a best-value analysis to justify its failure to select Metcalf. Since no such analysis was done, it is unclear whether awarding the contract to a bidder other than Metcalf would have been supportable, even though defendant contends that Metcalf was ranked third technically among the other offerors (see discussion under Count IV *infra*). Therefore, had it not been *for defendant's failure to sufficiently notify* Metcalf of its meaning of the Section 1A.7 "budget ceiling," there was a reasonable likelihood that Metcalf would have been awarded the contract.

**COUNT II:** Bidders Were Treated Unequally

A. *Facts*

When Unnamed Corp. exceeded two of the budget ceilings in its initial proposal (App. B, page 1 of 2, Rpt. of June 4, 2001), the CS recommended that "[Unnamed Corp.'s] proposal be kept within the competitive range as its price for each line item is not considered excessive." AR at 157. The CS further recommended that the following explicit warning be included with Unnamed Corp.'s technical discussion questions (which in fact appeared verbatim in its cover letter):

> "Based on our evaluation of your price proposal, it appears that you may have mis-assigned costs to the respective projects included in this RFP. The RFP, paragraph 1A.7, established budget ceilings for each respective project. Having three projects overlap may have caused this mis-assignment of costs between each project's price proposal. Therefore, please keep in mind that costs for each project are to be kept within their respective projects, *e.g.*, demolition, earthwork, etc. Also, it is noted that enhancements to the design and/or construction were not requested by the RFP in order to maximize the potential of receiving price proposals that were below the budget ceilings for each project.
>
> Request you carefully review your price proposal to ensure that all costs are properly assigned to the appropriate projects, Item 0001, Option 0001 and Option 0002, and *do not exceed the budget ceilings established for each project.* If necessary, offer a revised price proposal that reflects the costs associated with the requirements identified in the RFP."

AR at 233.

Surprisingly, the cover letters accompanying Metcalf's and LLA's technical discussion questions did *not* include the same, nor any language for that matter, discussing the "budget ceilings" and the cautionary advice, to wit, "do not exceed the budget ceilings established for each project." At best, the only consistent information conveyed to all bidders in their respective discussion packages was Amendment 0008.[30]

Defendant failed to convey the same warning to LLA and Metcalf apparently because neither had exceeded the "budget ceilings" in the first round of proposals. With respect to the second and third round of proposals, all three bidders' price proposals were within the budget ceilings. (See App. B, page 1 of 2, Rpt. of Aug. 16, 2001 & page 2 of 2, Rpt. of Sept. 10, 2001). But upon submission of its fourth proposal, *i.e.*, the second final proposal revisions, Metcalf narrowly exceeded the budget ceiling for Option 0002 by [. . .]. (App. B, page 2 of 2, Rpt. of Sept. 13, 2001). As a consequence, Metcalf was eliminated from award consideration. Curiously, however,

30. *See* Amendment 0008, *supra* note 27.

plaintiff was not notified of its *disqualification* until *after* the contract had been awarded to LLA, during a debriefing at its request on October 2, 2001.

B. *Contentions of the Parties*

1. Plaintiff

With respect to this issue, Metcalf firmly contends that bidders were treated unequally by the Navy during discussions which placed Metcalf at a decided competitive disadvantage. Pl.Mem. at 15. Plaintiff cites to the operative language of FAR 15.306(e)(1), to wit: "Government personnel involved in the acquisition shall not engage in conduct that—favors one offeror over another." Pl.Mem. at 15. Given such, Metcalf urges that the Navy clearly violated the foregoing regulation when it expressly informed Unnamed Corp. during discussions that Section 1A.7 established budget ceilings for each separate line item at which time Unnamed Corp., only, was instructed *not to exceed those budget ceilings.* Pl.Mem. at 16. Thus, at no time during the period of discussions or proposal evaluation was Metcalf advised of defendant's understanding of Section 1A.7. *Id.* That failure of defendant to overtly inform Metcalf constitutes clear unequal treatment which ultimately led to Metcalf's elimination from award consideration. Pl.Mem. at 17.

2. Defendant

Conversely, defendant explains that when it did not receive any acceptable initial offers, it consequently held discussions with all offerors. Def. Reply at 14. It further maintains that because plaintiff did not suffer from any deficiencies/errors in its initial price proposal, no discussions regarding price were held with plaintiff. *Id.* The Navy argues that FAR § 15.306(d)(1) does not require that the agency conduct exactly the same discussions with each offeror, rather "discussions are [permissibly] tailored to each offeror's proposal." Def. Motion at 19. Two (2) recent cases from the Court of Federal Claims are cited to by defendant to support its position. First, *ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 77 (2001), is cited as stating that "while the regulations require meaningful and fair discussions, they do not require that the agency conduct exactly the same discussions with each offeror." Def. Motion at 20. Next, *WorldTravelService v. United States,* 49 Fed. Cl. 431, 440 (2001), likewise, is cited to state that: "while offerors must be given an equal opportunity to revise their proposals, and the FAR prohibits favoring one offeror over another, discussions need not be identical; rather discussions are to be tailored to each offeror's proposal." Def. Motion at 20.

The Navy argues that the circumstances were entirely different when it decided to conduct discussions after receipt of the initial proposals, as compared to its decision not hold additional discussions after receipt of the second final proposal revisions. Def. Motion at 21–22. "Upon receipt of initial proposals, the agency had no acceptable offers." Def. Motion at 22. That is, "[t]he June 13, 2001 TEB report identified correctable technical weaknesses in each of the three proposals, rendering each less than acceptable [or marginal] overall." Def.Stmt. of Facts at 8, ¶ 25. In response to the weaknesses found in Unnamed Corp.'s initial proposal, the Navy informed Unnamed Corp. of its price proposal violations. Def. Motion at 22. Plaintiff, on the other hand, did not have a defect in its initial price proposal, therefore, no such discussions were had with plaintiff.[31] *Id.*

It was not until the fourth round of submissions, after the bidders had twice received notice of the close of discussions, that the plaintiff violated the budget ceiling. *Id.* At that time, avers defendant, it reasonably elected to proceed with award consideration between the remaining two qualifying bidders, "rather than hold [yet another round of] discussions for the sole benefit of plaintiff." *Id.*

C. *Analysis*

Clearly, against the foregoing background, the bidders were treated unequally where

31. In fact, plaintiff's first three submissions were all in conformance with Section 1A.7. Def. Motion at 20.

one bidder was advised, in no uncertain terms, not to exceed the budget ceilings, and a second bidder under identical circumstances was not. Amendment 0008, standing alone, cannot be said to have been sufficient to cure the potential defect that the CS warned of in its June 4, 2001 report. Yet defendant complains about its apparent obligation to hold another round of discussions, when over the course of the evaluation process, it issued a total of ten (10) amendments. On this record, one more clarifying statement would have only enhanced the quality of the procurement process, and served the interest of (1) fairness, when another bidder had received a prior warning, and (2) competition, when there were only a total of three bidders under consideration. The same exercise of discretion that the Navy employed when the first non-compliant bidder was not eliminated when it exceeded the line-item budget ceilings, should have been rationally extended to Metcalf, as well. At what point in the process that each infraction by plaintiff and Unnamed Corp. occurred is of no moment, on this record. What is of singular importance is fundamental fairness in administering the process.

The court, here, is not attempting to replace the agency's reasoning with its own. To the contrary, the court is simply attempting to hold the agency to a consistent, equal and rational application of its procedures to each and every bidder. Defendant clearly was required to notify the other bidders regarding the budget ceiling clarification when one bidder made an inquiry, and this is particularly true when that same bidder (by all appearances), itself, misunderstood defendant's answer. Defendant's failure to effectively notify the other bidders of its interpretation of Section 1A.7 using the same clear and unequivocal language in which another bidder was notified, we hold, constitutes unfair and unequal treatment.

D. *Prejudice*

Prejudice to plaintiff has been established for the same reasons stated under Count I, *supra.*

**COUNT III:** The SSB Improperly Downgraded Metcalf's Rating For Factor C—Small Business Utilization

A. *Facts*

The subject RFP contained five component Technical Evaluation Factors: Factor A—Past Performance, Factor B—Qualifications and Experience, Factor C—Small Business Utilization, Factor D—Technical Approach, and Factor E—Management Plans. This issue centers on the *final* overall rating that Metcalf received for Factor C, which comprised two subfactors as follows:

> "Factor C represents Small Business Utilization comprising two equally weighed subfactors: (1) past performance on utilization of small business concerns and (2) proposed subcontracting of subject project."

AR at 806.

The final TEB report dated September 10, 2001 reflects the following Factor C ratings for each of the offerors:

| FACTOR C: | Subfactor 1 | Subfactor 2 | Overall Rating |
|---|---|---|---|
| Unnamed Corp. | [ ] | [ ] | [ ] |
| LLA | [ ] | [ ] | [ ] |
| Metcalf | "NR" | HA | HA |

(App. A, page 3 of 4). Upon its review of the TEB report, the SSB changed Metcalf's overall rating for Factor C from "HA" to "A." (See App. A, page 4 of 4, Rpt. of Sept. 24, 2001).

The gravamen of this issue lies with the "NR" rating assigned to Metcalf's subfactor 1. According to the SSP, a rating of "NR" is warranted under the following circumstances:

> "If the offeror does not have a record of relevant past performance or past performance information is not available, the offeror's rating for past performance will not be evaluated favorably or unfavorably on past performance. In other words, the offeror will receive a 'neutral' rating for Factor A. Furthermore, Offerors with favorable past performance history will be evaluated more favorably than Offerors with no record of relevant past perfor-

mance history or no past performance information is available."

AR at 53.

It is important to note that the first sentence of the above instructions mirrors 41 U.S.C. § 405(j)(2),[32] and, while the instructions only contemplate the "NR" rating as affecting Factor A, that rating also applies to the past performance subfactor (1) under Factor C.

B. *Contentions of the Parties*

1. Plaintiff

Metcalf contends that the SSB violated 41 U.S.C. § 405(j)(2) when it downgraded Metcalf's Factor C rating from "Highly Acceptable" (HA) to "Acceptable" (A). Pl.Mem. at 17. Inasmuch as Metcalf itself is considered a small business concern ("SBC"), it is not required to utilize other SBCs on its projects. *Id.* Therefore, avers plaintiff, it was properly assigned a "No Rating" ("NR") for subfactor 1. *Id.* With respect to subfactor 2, Metcalf received a "Highly Acceptable" rating for the reason that it is itself an SBC, and it would be performing under the contract if awarded. Pl.Mem. at 18. Whereas the TEB, in its assessment of Metcalf, rated the overall Factor C "Highly Acceptable," the SSB downgraded Metcalf's rating to "Acceptable." *Id.* In so doing, Metcalf contends, the SSB applied the "NR" rating in a manner unfavorable to Metcalf (apparently by averaging the "NR" and "HA" subfactor ratings to a net "Acceptable" rating), in violation of 41 U.S.C. § 405(j)(2). *Id.*

2. Defendant

Defendant begins by averring the fact that "the SSB did not downgrade plaintiff's Factor C proposal from a 'highly acceptable' to an 'acceptable' rating, as plaintiff never attained an official rating for Factor C that was higher than 'acceptable.'" Def. Motion at 24. Continuing, defendant informs us that while the TEB recommended a "highly acceptable" rating for plaintiff, the SSB did not adopt that recommendation. *Id.* The reason given by the SSB was that the TEB's recommendation was flawed inasmuch as: (1) it was inconsistent with the rating scheme stated in the solicitation, and (2) it was inconsistent with the manner in which the other offerors' proposals were rated. Def. Motion at 25.

According to the solicitation, avers defendant, subfactor 1 required "outstanding past performance" in order to attain a "highly acceptable" rating. *Id.* Metcalf's past performance yielded a neutral rating which means that the standard stated in the RFP simply was not met. *Id.* Furthermore, both of the other two offerors received one "acceptable" and one "highly acceptable" rating for these subfactors, and both offerors received an overall rating of "acceptable." Def. Motion at 25–26. "The Navy therefore, [sic] rated all offerors equally, consistently, and fairly, as each offeror receiving one 'highly acceptable' and one 'acceptable' (or 'neutral') received an overall 'acceptable' rating." Def. Motion at 26.

C. *Analysis*

We disagree with defendant that plaintiff never attained an "official" rating for Factor C that was higher than "Acceptable." Although it is clear from the record that the TEB's authority is subordinate to that of the SSB, the role of the TEB *is* unquestionably to "rate each proposal," "support ratings assigned," and "justify assigned ratings." SSP, AR at 46–48. Therefore, ratings *assigned* by the TEB *are* "official," notwithstanding they may be advisory in effect; that is, they are recommendations that may be overturned by the SSB. Subsequently, the SSB acted entirely within its scope of responsibility when it rejected the overall Factor C rating of "HA" recommended by the TEB, and assigned a final Factor C rating of "A." The precise question before us now is whether the SSB properly *evaluated* the *neutral* ("NR") rating assigned to plaintiff in subfactor 1 of Factor C in the process of re-

32. "In the case of an offeror with respect to which there is no information on past contract performance or with respect to which information on past contract performance is not available, the offeror may not be evaluated favorably or unfavorably on the factor of past performance." 41 U.S.C. § 405(j)(2).

assigning Metcalf an overall Factor C rating of "A." Stated differently, the question is—whether in the process of writing the overall Factor C rating down from "HA" to "A," did the SSB include in the equation a quantification attributable to subfactor 1 of Factor C. To this question, we answer affirmatively.

We are guided by the principle that procurement officials are entitled to broad discretion in the evaluation of bids and in the application of procurement regulations, and that the plaintiff bears a heavy burden of showing, by clear and convincing evidence, either that (1) the agency's decision-making process lacked a rational or reasonable basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Day & Zimmermann,* 38 Fed.Cl. at 597. Turning to the operative statute, 41 U.S.C. § 405(j)(2) (its legislative history included), we find that it provides little or no guidance on how to apply an evaluation factor that is *neither favorable nor unfavorable, i.e.,* neutrality, within an adjectival rating scheme.

The plain meaning of the word neutral is: "Not allied with, supporting, or favoring either side ... Not one thing or the other: indifferent;" [33] i.e., having no effect, null or zero. When a literal interpretation is given to the statute, and a zero (or null) value is applied to the neutral rating factor, the subject offeror's overall rating suffers as compared to other bidders.[34] In the case at bar, the offeror is partially spared from the harshest possible result because the neutral rating occurs in only one of two equally weighted subfactors, instead of a whole category or factor. Operating from the standpoint of strict adherence to the language of the statute, no value or a null value should be substituted in the past performance subfactor under Factor C as illustrated below:

According to the solicitation, the ratings in both subfactors, "NR" and "HA," are "equally weighted." Therefore, the logical first-blush inclination would be to "average" the two ratings to arrive at a single overall rating. Since these ratings are adjectival, rather than numerical, an exact (quantitative) value or rating cannot result. We are thereby faced with the confines of solving an equation of non-quantitative variables, which logically, we know, must yield a result that is lower than "HA," but for which the actual result is speculative. (If this were a numerical scheme, and HA = 3, and A = 2, the outcome would be 1.5, which is a rating lower than "Acceptable"). This court, therefore, and in conjunction with the administrative cases cited above condemning the "zeroing effect," rejects the functionality (and fairness) of a null value application since said application has the effect of treating the offeror unfavorably.

While the court found no binding authority on this issue, we have looked to the numerous administrative decisions dealing with the applicable statute. There are a couple of variations in applying the statute which have been contrived in order to avoid the otherwise harsh outcome that results from a literal application of the statute (the zeroing effect). First, there is assigning a *quantitative* value to the neutral rating reflecting the mid-point of the applicable rating scale; *e.g.,* "good," or

33. Webster's II New College Dictionary 735 (1995).

34. *Chicataw Constr., Inc.,* 2002 WL 450054, *6 (Comp.Gen. Mar.20, 2002) ("[R]atings of zero generally cannot be reasonably viewed as neutral ratings, and they thus violate the requirement that an offeror without past performance information may not be evaluated favorably, or unfavorably."); *NAHB Research Center, Inc.,* 1998 WL 314478, *4 (Comp.Gen. May 4, 1998) ("[W]e agree with the protester that the inclusion of 'not applicable' answers in the scoring of one evaluator was unreasonable, since it effectively penalized an offeror for lack of experience in a particular area in violation of the requirement that firms lacking relevant past performance history shall receive a neutral evaluation for past performance...."); *see also Meridian Mgmt. Corp.,* 2000 WL 1097129, *2 n. 2 (Comp.Gen. July 19, 2000) (citing *NAHB Research*) ("[T]he inclusion of a score of 0 for past performance for an area in which the offeror in fact has no experience serves to lower the offeror's overall past performance score, in violation of the requirement that firms lacking relevant past performance history receive a *neutral* evaluation for past performance") (emphasis added); *Inlingua Schools of Languages,* 1988 WL 227429, *3 (Comp.Gen. Apr.5, 1988) ("Rather than having the intended neutral effect on the score for prior performance, however, the 'n/a' notations caused Inlingua's proposal to be downgraded....").

"satisfactory." [35] And, in the case of a numerical rating scheme, a number representing the mid-point of the applicable rating scale is assigned.[36] Alternatively, there are other cases where the category with the "NR" rating is totally eliminated for the affected bidder(s).[37] We will look at each approach separately.

1. Quantitative Approach

This court is unpersuaded that the assignment of *any value* at all to a *neutral* rating operates within the meaning of the statute since—"the offeror may not be evaluated favorably or unfavorably on the factor of past performance." Surely even a middle value may favor or disfavor an offeror. The defendant apparently applied this "mid-point" theory, by treating the neutral rating as equivalent to the "Acceptable" rating—"The Navy therefore, [sic] rated all offerors equally, consistently, and fairly, as each offeror receiving one 'highly acceptable' and one 'acceptable' (or 'neutral') received an overall 'acceptable' rating." Def. Motion at 26. The court rejects this approach as inconsistent with, and therefore violative of, the operative statute.

2. Exclusion Approach

Remaining, then, is the theory of totally eliminating the factor, or in this case, the subfactor, from the affected bidder's evaluation. In *Meridian Mgmt. Corp.*, past references questionnaires contained thirty-one (31) questions that were rated separately, then divided by 31 to arrive at an overall "experience/past performance score." The protester in that case argued that it was penalized when it received a "0" for a question regarding laboratory work that was "not applicable" in a prior contract. The agency involved in that solicitation agreed that the protester should not be penalized, and subsequently recalculated the protester's score by dividing the total for the thirty (30) *answered* questions by 30, instead of 31. In doing so, the agency totally eliminated the question that was "not applicable" to the protester from its overall "experience/past performance score."

The court finds that the approach taken in *Meridian* is the better approach, which neither (1) treats the bidder favorably nor unfavorably by unduly quantifying (as "Acceptable") the neutral rating, nor does it (2) lead to a speculative or unfavorable result (via averaging). Therefore, under the *Meridian* approach, subfactor 1 of Factor C, in the case at bar, is completely eliminated from Metcalf's Factor C evaluation, since subfactor 1 is, in effect, "not applicable" to Metcalf. Thus, Metcalf is to be evaluated purely on subfactor 2, which, in this case, becomes its overall rating for Factor C, to wit, "HA." This approach is consistent with the outcome derived by the TEB in its September 10, 2001 report. (App. A, page 3 of 4).

D. *Prejudice*

In our succeeding analysis, we keep in mind that minor errors or irregularities, *i.e.*, harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision. *Day & Zimmermann*, 38 Fed.Cl. at 597 (citing 5 U.S.C § 706(2)) (court must take into account the rule of prejudicial error). In order to establish a prejudicial error, a protestor is not required to show that but for the alleged error, the protestor would have been awarded the contract. *Id.* (citations omitted). Instead, a protestor must only show that, had it not been for the alleged error, there was a reasonable likelihood that it would have been awarded the contract. *Id.* (citations omitted).

Although plaintiff was (allegedly) eliminated for reasons not related to its technical qualifications, it appears (from the discussion in Part IV, *infra*) that the *SSB* relied, to

35. *See Braswell Services Group, Inc.*, 1998 WL 377702 (Comp.Gen. June 17, 1998); *International Bus. Sys., Inc.*, 1997 WL 113958 (Comp.Gen. Mar.3, 1997).

36. *See Chicataw Constr., Inc.*, 2002 WL 450054 (Comp.Gen. Mar.20, 2002).

37. *See Meridian Mgmt. Corp.*, 2000 WL 1097129 (Comp.Gen. July 19, 2000); *Espey Mfg. & Electronics Corp.*, 1994 WL 74006 (Comp.Gen. Mar.8, 1994).

some extent, on the total number of HA's attained by Metcalf to justify "ranking" it overall "third" technically. From about September 10, 2001, forward, plaintiff was perceived by the Navy as being technically inferior to the other two bidders. A reasonable inference can be drawn therefrom that plaintiff's diminished (third place) "ranking" caused defendant to eliminate Metcalf rather than hold additional discussions. Note paragraph 1B.6 of the solicitation:

> "The Government intends to evaluate all proposals received and award a contract without discussions. However, *if discussions are deemed necessary, to maximize the Government's ability to obtain the best value, discussions will be held* with those offerors within the competitive range. The Government may limit the number of proposals in the competitive range to *the most highly qualified proposals,* considering price and technical factors."

AR at 819 (emphasis added).

Arguably, had Metcalf been perceived by defendant as a technically equal or superior candidate, there is a reasonable likelihood that defendant would have exercised its discretion to hold additional discussions with Metcalf rather than to eliminate it from the competitive range, considering that plaintiff was the lowest-priced offeror under the HUBZone preference. The foregoing analysis would be sufficient to show prejudice if plaintiff's "ranking" had, in fact, been a direct result of the number of HA's appearing on the SSB's final technical evaluation report. (App. A, Rpt. of September 24, 2001, page 4 of 4). The probability, however, is that the ranking was not a result of the number of HA's given, since the TEB had previously ranked Metcalf third despite the fact that all offerors, as of September 10, 2001, had two HA's and three A's. (App. A, page 3 of 4).

As ventilated under Count IV *infra,* defendant's problem with the ranking is that the basis for such is not clearly stated in the record. At the very least, a modicum of prejudice can be found as a result of the "ranking," but not so for the Factor C rating. The record indicates, as the court has discussed *supra,* that the Factor C rating came about as the result of an incorrect application of the statute, but only after the ranking had been asserted by the TEB. Therefore, plaintiff has not met its heavy burden of showing a clear and *prejudicial* violation of applicable statutes or regulations. Instead, we find the erroneous Factor C rating assigned by the SSB to be a harmless error, in effect, but one which must be corrected upon re-evaluation of the offeror.

**COUNT IV:** The Navy Employed An Unstated Evaluation Scheme And Failed To Conduct A Best Value Analysis

A. *Facts*

The Technical Evaluation Rating Scheme applicable to the subject solicitation was outlined in Paragraph 1B.5 of the RFP as follows:

> "The following technical rating scheme shall be used in evaluation of each technical evaluation factor as well as the overall rating of each offeror's technical proposal. In accordance with the maximum quality criteria set forth in this manual, the TEB will assign the following: HIGHLY ACCEPTABLE (HA); ACCEPTABLE (A); MARGINAL (M); UNACCEPTABLE (U)."

AR at 817–818.

Upon the completion of the *initial* technical evaluation of the offerors' proposals, on or about June 13, 2001, the TEB issued a report rating all three offerors as "Marginal." (App. A, page 1 of 4, Rpt. of June 13, 2001). As a result, the TEB recommended that discussions be held with each offeror to address the correctable technical weakness in their respective offers. Discussion letters were mailed on or about August 8, 2001, and revised proposals were received by August 15, 2001 from each offeror. Upon review of these revised proposals, LLA and Unnamed Corp. received improved technical ratings of "Acceptable," while Metcalf's rating remained "Marginal." (App. A, page 2 of 4, Rpt. of Aug. 22, 2001).

On September 6, 2001, a "Final Proposal Revision" was requested from all offerors whereby additional discussion questions were issued to Metcalf regarding its remaining technical weaknesses. On September 10,

2001, having received Final Proposal Revisions from all offerors, the TEB issued an amended technical evaluation report. Therein, Metcalf received an improved overall technical rating of "Acceptable," although it was considered by the Navy to be ranked third technically behind the other two offerors. (App. A, page 3 of 4, Rpt. of Sept. 10, 2001).

B. *Contentions of the Parties*

1. Plaintiff

Plaintiff takes exception to the fact that the Navy: (1) ranked it third technically, overall, among the other offerors, and (2) stated that Metcalf did not "necessarily" offer the best value to the agency. Pl.Mem. at 19. Pointing to FAR 15.304(d) which states that "[a]ll factors and significant subfactors that will affect contract award and their relative importance *shall be stated clearly in the solicitation,*" the plaintiff contends that there is no explanation in the solicitation or source selection plan on how offerors would be ranked. *Id.* As a consequence, plaintiff concludes that the Navy acted arbitrarily, and/or utilized an evaluation scheme that was unknown to the bidders. *Id.*

Furthermore, Metcalf contends that had it not been arbitrarily and erroneously eliminated from the competitive range, the Navy would have been required to conduct a best value analysis. *Id.* Plaintiff posits that the Navy is required under FAR 15.101–1(c) [38] to document the perceived benefits from award of a best value contract to a higher evaluated priced offeror. *Id.* Therefore, concludes plaintiff, if Metcalf is reinstated in the competitive range, the Navy cannot award the contract to LLA without first performing a best value analysis. Pl.Mem. at 20.

2. Defendant

The Navy responds that the RFP explains in great detail the Navy's evaluation process. Def. Motion at 28. Defendant states that "the three TEB reports and the SSB report provide a plethora of information regarding the Navy's analysis of all proposals received, and technical evaluations and rankings, including explanations of plaintiff's third-place ranking." Def. Motion at 28–29 (citing AR at 88–154, 310–446, 605–658, 738–752). Moreover, the Navy argues that "the TEB and SSB explained in great detail, plaintiff's weaknesses as compared to the other two offerors, and the reasons why plaintiff was ranked third overall of the three offerors in the technical area," notwithstanding the fact that each of the three offerors received the identical rating, *i.e.,* "Acceptable." Def. Motion at 29 (citing AR at 380–446, 605–658, 738–752, 2839–2840, 2865–2866).

Because the plaintiff, in effect, removed itself from the competition, avers defendant, when it exceeded the cost limitation for Option 0002, the trigger [39] compelling the Navy to conduct a best value analysis never occurred. Def. Motion at 29. The Navy was left with only two qualifying offerors who were ranked technically equivalent to one another, therefore, the Navy awarded the contract to the lowest-priced of the remaining offerors, to wit, LLA. *Id.*

C. *Analysis*

Again, there is a dearth of binding authority on this issue, but there are several persuasive administrative decisions that are precisely on point. Overwhelmingly, those decisions support the following:

> "There is nothing improper with the agency identifying strengths and weaknesses under an adjectival rating scheme, as the agency did here. Adjectival ratings and point scores are only a guide to assist agencies in evaluating proposals; information on advantages and disadvantages of proposals is the type of information that

38. "Tradeoff Process. This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406." FAR 15.101–1(c).

39. A best value analysis is required when there are two or more technically equivalent bidders, and the contract is not awarded to the lowest-priced bidder.

source selection officials should have in addition to ratings and point scores to enable them to determine whether and to what extent meaningful differences exist between proposals. Proposals with the same adjectival rating are not necessarily of equal quality and the agency may properly consider specific advantages that make one proposal of higher quality than another."

*Oceaneering Int'l, Inc.*, 2001 WL 695072, at *10 (Comp.Gen.2001) (citations omitted). *See also F2M–WSCI*, 1998 WL 11615, at *6 (Comp.Gen.1998); *A & W Maint. Services, Inc.*, 1995 WL 19601, at *2 (Comp.Gen.1995); *Hattal & Assoc.*, 1991 WL 162541, at *5 (Comp.Gen.), 70 Comp.Gen. 632, 638 (1991).

This court is inclined to embrace the same treatment of this issue. In support of this rule, the reviewing agency looked to the record to find instances where the contracting agency stated the "specific advantages that ma[d]e one proposal of higher quality than another." Defendant, in its motion, directs us to several places in the administrative record where it claims to have stated with specificity "plaintiff's weaknesses as compared to the other two offerors." Following the defendant's lead, we attempted to locate its clearly stated *comparative* weaknesses, but to no avail. We found only the following conclusory remarks by the SSB in its report to the SSA dated September 24, 2001:

"It is noted that although [Unnamed Corp.'s], LLActus' and MCCI's [Metcalf] proposals were all rated technically 'acceptable,' [Unnamed Corp.'s] and LLActus' technical proposals were ranked *higher than MCCI's proposal.* [Unnamed Corp.] and LLActus had both received 'Highly Acceptable' ratings in *two* different evaluation factors. MCCI received only *one* 'Highly Acceptable' rating."

AR at 749.

While defendant is permitted to take notice of "meaningful differences [that] exist between proposals," it has failed to pointedly articulate the "specific advantages that ma[d]e one proposal of higher quality than another," on this record. Defendant recorded the strengths and weakness of all of the offerors, but placed no particular emphasis on those areas, positively or negatively.[40] The remark that the other offerors received two HA's while plaintiff only received one HA is superficially weak and inconclusive, not to mention its flawed reasoning.

This is so, inasmuch as the plaintiff has already overcome the fact that it had received only one HA, by having received enough A's to achieve an overall rating of "A." The two HA's received by the other offerors were still only enough for them to attain an overall rating of "A." Once all of the bidders have the same adjectival rating, in order to reasonably and rationally rank them, the Navy must go beneath those ratings to show specifically where it finds advantages in one "Acceptable" offer over another "Acceptable" offer, notwithstanding the sameness of the ratings.[41]

This leads us to the next observation that, of the two HA's received by the other offerors, only one was in the same category. (See App. A, page 4 of 4, Rpt. of Sept. 24, 2001). If the defendant points to those HA's as providing specific advantages, it only further proves its own arbitrary method of "ranking." In other words, which of those other two categories offer a specific advantage to the Navy? Both of them? Either of them?

40. The TEB, in its amended technical evaluation report dated September 10, 2001, provided the following summation regarding Metcalf:

"MCCI's proposal is ranked third due mainly to the fact that MCCI's proposal received a Highly Acceptable (HA) rating for Factor A, based primarily on their design team's past performance and MCCI's lack of negative past performance ratings. MCCI received a rating of Acceptable (A) for Factor B based mainly on the qualifications and experience of their design team. Factor C received an overall rating of Highly Acceptable (HA) based mainly on MCCI's certification as a HubZone SBC. MCCI's overall ratings for Factors D and E were revised from Marginal (M) to Acceptable (A) based on their final proposal revision submission."

AR at 608–609. It is unclear from the above comments, what exactly was necessarily unfavorable or comparatively less desirable to the Navy.

41. Under the Navy's reasoning, the plaintiff has been twice evaluated based upon the same table of data; *i.e.*, the number of HA's and A's attained.

Would any other category suffice? Clearly there is no specificity nor rationality in such choices, which re-enforces the flaw in the reasoning that more HA's, alone, amount to a superior ranked proposal. This cannot be the case when the number of HA's have already received the appropriate weight. With nothing more to go on, defendant's "ranking" of plaintiff as "third technically" is vague, conclusory and unsupported on this record, and is, therefore, arbitrary.

As for conducting a best value analysis, the defendant is correct. Since Metcalf was eliminated from the competitive range, rightly or wrongly, there in fact was no "trigger" for conducting the best value analysis because the remaining two bidders were (allegedly) of equal technical quality and the lowest-priced bidder prevailed.

D. *Prejudice*

Although plaintiff was (allegedly) eliminated for reasons not related to its technical qualifications, it nonetheless received a final overall "Acceptable" technical rating which was diminished by a less than favorable "third" technical "ranking." From about September 10, 2001, forward, plaintiff was perceived by the Navy as being technically inferior to the other two bidders. A reasonable inference can be drawn therefrom that but for defendant's (tenuously-devised) perception, Metcalf may have been treated as being more vital to the competitive process. That is to say, had Metcalf been perceived as a technically equal or superior candidate, there is a reasonable likelihood that the defendant would have been more inclined to have exercised its discretion not to eliminate it from the competitive range.[42] This court, therefore, finds that there is a *reasonable inference* or modicum of prejudice toward the plaintiff due to the unsupported ranking of third technically overall.

COUNT V: Elimination Of Metcalf Under The Circumstances Was Unreasonable

A. *Facts*

On or about September 24, 2001, the SSB eliminated Metcalf from the competitive range of the competition for the stated reason that it had exceeded Option 0002's budget ceiling, *i.e.*, $5,400,000, by [. . .] (or a margin of less than [. . .]). Metcalf was informed by letter dated September 28, 2001 that the contract had been awarded to LLA. During a debriefing on October 2, 2001, at Metcalf's request, it was told that it had been eliminated from award consideration for noncompliance with Section 1A.7. (See App. B, page 2 of 2, Rpt. of Sept. 13, 2001).

B. *Contentions of the Parties*

1. Plaintiff

Even assuming *arguendo* that the budget ceiling related to separate bid line-items, elimination of Metcalf under these circumstances was patently unreasonable. Pl.Mem. at 20. Plaintiff postulates that the use of the word "will" in Section 1A.7[43] does not mandate automatic elimination of the offeror. *Id.* It argues that Section 1A.5 of the RFP, Instructions of Offerors, permits the government to waive informalities and *minor* irregularities in proposals. *Id.* (citing AR at 804). Under the circumstances in this case, plaintiff avers that "Section 1A.7 should provide precatory guidance rather than establishing a mandatory standard." Pl.Mem. at 21. Metcalf, therefore, avers that it was patently unreasonable for the Navy to remove it from the competition due to its failure to fall within the ceiling for Option 0002 by the *de minimis* amount of [. . .] (less than [. . .] of the budget ceiling), and not opt to exercise its discretion under Section 1A.5 of the solicitation. *Id.* This is particularly true considering the fact that Option 0002 work has not yet been awarded. *Id.*

42. Again note paragraph 1B.6 of the solicitation: "The Government intends to evaluate all proposals received and award a contract without discussions. However, *if discussions are deemed necessary, to maximize the Government's ability to obtain the best value, discussions will be held* with those offerors within the competitive range. The Government may limit the number of proposals in the competitive range to *the most highly qualified proposals,* considering price and technical factors." AR at 819 (emphasis added).

43. "Proposals in excess of this amount will *not* be considered."

2. Defendant

Plaintiff ignores the fact, states defendant, that section 1A.7 is a material requirement that requires offerors to submit prices within the stated budget ceilings. Def. Motion at 31. Further, Amendment 0007 specifically changed the wording in section 1A.7 to read: "Proposals in excess of this amount will *not* be considered."[44] *Id.* The Navy did, it is averred, exactly what it promised to do when it eliminated an offeror for exceeding a cost limitation. Def. Motion at 33.

C. *Analysis*

Where an agency's decision is found to be reasonable, a court may not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. But where the agency's finding cannot be sustained on the administrative record, the agency's decision must be set aside. *See* 5 U.S.C. § 706(2)(A). Metcalf's elimination from the competition for exceeding the budget ceiling for Option 0002 was not, *ipso facto,* unreasonable, assuming, of course, the same standard for elimination was, in fact, applied consistently to all other bidders. It is well-settled that procurement officials are entitled to broad discretion in the evaluation of bids and in the application of procurement procedures. *See Day & Zimmermann,* 38 Fed.Cl. at 597. The question here becomes a hybrid one between reasonableness and capriciousness; that is, whether the same *reasonable* standard for elimination was applied with unbridled *consistency.* We find that it clearly was not, and that Metcalf's elimination from the competition was, on this record, arbitrary and capricious, and therefore, patently unreasonable.

As discussed under Count II *supra,* another bidder received only a hospitable warning when it exceeded two of the budget ceilings, but Metcalf was held to the strict letter of the (Navy's interpretation of the) solicitation. Defendant argues that the timing within the evaluation process was the determining factor. For reasons already discussed by this court, the defendant's argument is unpersuasive. The point in the process at which each infraction occurred is of no moment here when taking into account the strong likelihood that Metcalf's error resulted from the apparent ambiguity found in Section 1A.7 (for which defendant bears the burden of the defect). Instead of recognizing the propriety of yet another possible warning regarding the Section 1A.7 defect, defendant responded with exasperation by refusing to clarify its interpretation to Metcalf.

Defendant's reasoning raises further question by the fact that it viewed pricing qualifications and technical qualifications separately. Even though the SSB took the time to evaluate Metcalf's technical ability, that technical ability (and/or alleged weaknesses) had no bearing on its price (non)compliance; ergo, it was (allegedly) eliminated outright solely on price. Since price matters, alone, were grounds for elimination, the first breach by Unnamed Corp. should have caused it to have been eliminated, as well. Where one bidder was given an opportunity to correct its pricing weaknesses, and another bidder was not, Metcalf's elimination for exceeding the Option 0002 budget ceiling was patently arbitrary and capricious, and therefore, lacked a reasonable basis. This is particularly true given the exceedingly paltry amount of the excess.

D. *Prejudice*

Plaintiff was clearly prejudiced here for the same reasons discussed under Count I, *supra.*

**COUNT VI:** The Navy Failed To Properly Apply The HUBZone Evaluation Preference

A. *Facts*

As discussed *supra,* price evaluation reports were compiled four (4) times during the course of the bidding process by the Contract Specialist.[45] The CS prepared such reports for the benefit of, and subsequently remitted them to, the SSB. Each time, the proposed prices for the Base Item, Option 0001 and Option 0002 were totaled for each

44. Prior to Amendment 0007, Section 1A.7 read: "Proposals in excess of this amount may not be considered."

45. See Appendix B.

offeror, then a ten percent (10%) margin was added to the bid prices offered by LLA and Unnamed Corp., reflecting the HUBZone preference pursuant to the operative statute, 15 U.S.C. § 657a(b)(3)(A), which provides in pertinent part as follows:

> "[I]n any case in which a contract is to be awarded on the basis of full and open competition, the price offered by a qualified HUBZone small business concern *shall be deemed as being lower than the price offered by another offeror* (other than another small business concern), if the price offered by the qualified HUBZone small business concern is not more than 10 percent higher than the price offered by the otherwise lowest, responsive, and responsible offeror."

(Emphasis added).

Hence, the 10 percent margin was added to the prices of the other two offerors to determine whether Metcalf's price was more than 10 percent in excess of the other offerors' respective prices. In each of the four price compilation reports, Metcalf's price did not exceed the other offerors' prices by more than 10 percent of the prices of its competitors. However, on or about September 24, 2001, when the SSB was to officially decide the lowest-cost bid for award purposes, it had already eliminated Metcalf from the competitive range for alleged non-conformance with Section 1A.7. Therefore, the SSB was left to determine the lowest-cost bid of the remaining two bidders, neither of which were HUBZone contractors, causing the 10 percent preference to have no effect in their determination with respect to the applicable statute.

B. *Contentions of the Parties*

1. Plaintiff

Plaintiff avers that the Navy failed to properly apply the HUBZone evaluation preference.[46] It states that "the preference is required by the statute on all offerors at the time of receipt of proposals in full and open competition without exception even if it means displacement of the otherwise lowest, responsive and responsible offeror." Pl. Mem. at 24. According to plaintiff, application of the 10 percent preference to the bid prices of LLA and Unnamed Corp. required the immediate elimination of their proposals under the Navy's interpretation of Section 1A.7. *Id.*

2. Defendant

Conversely, defendant replies that the application of the 10 percent preference is not for the purpose of eliminating other offerors with respect to established budget ceilings. Def. Motion at 37. Rather, it is to be applied for price *evaluation* purposes; *i.e.*, determining the lowest overall bidder. *Id.* According to defendant, Metcalf *was* deemed to have had the lowest evaluated price compared to the other offerors. Def. Motion at 35. Defendant argues that Metcalf's position—that the HUBZone preference, when applied, causes the other bidders to exceed the budget ceilings—defies logic. Def. Motion at 36. To be sure, the Navy is only bound to pay LLA the price *offered* by LLA, and not that figure plus a 10 percent premium. Def. Motion at 36–37. It follows, then, that the *evaluated* price (which was the offered price increased by 10 percent) has no relation to the budget ceiling(s). Def. Motion at 37.

C. *Analysis*

The court finds that the Navy did not misapply the HUBZone preference. Plaintiff's argument is unsupported in law, while defendant, on the other hand, demonstrates what we perceive to be the correct application of the law. In accordance with the operative statute, the contracting specialist added 10 percent to the prices proposed by the other two offerors, then compared those adjusted prices to that of Metcalf, to ascer-

**46.** Plaintiff points to 15 U.S.C. § 657a(b)(3)(A), and to paragraph 1B.8 of the RFP (as amended):

> "PRICE EVALUATION. Price proposals will be evaluated in accordance with FAR 52–217–5, Evaluations of Options. For evaluation purposes, the price for pre-priced Options 0001 and 0002 will be added to the Item 0001 price. Upon addition of Item 0001, Option 0001 and Option 0002 prices, prices will be evaluated in accordance with FAR 52.219–4, Notice of Price Evaluation Preference for HUBZone Small Business concerns. The Offeror's price will be evaluated and compared against its relative technical quality of its proposal."

tain whether Metcalf's price exceeded its competitors' adjusted prices. Based on the record, Metcalf clearly had the lowest-cost bid when compared with its competitors' adjusted prices. But, nevertheless, Metcalf was erroneously eliminated for unrelated reasons discussed *supra*. Therefore, the defendant properly applied the 10 percent HUBZone preference *for price evaluation purposes only*, and the plaintiff's argument that it should have been applied to eliminate the other offerors for exceeding the budget ceilings is rejected.

D. *Prejudice*

Plaintiff has not shown by clear and convincing evidence that this phase of the procurement involved a clear and prejudicial violation of the applicable statute(s). Instead, the court finds that the defendant Navy acted wholly in accordance with law.

**PRELIMINARY/PERMANENT INJUNCTION**

A. *Standard of Proof*

At this juncture in the proceeding, plaintiff's motion for preliminary injunction merges into its motion for permanent injunction. Accordingly, plaintiff must make three specific showings, by clear and convincing evidence, that it is entitled to the permanent injunctive relief which it seeks, to wit, (1) that it will suffer specific irreparable injury if the procurement is not enjoined; (2) that granting the relief serves the public interest, and (3) that the harm to be suffered by it if defendant prevails outweighs the harm to the Government and third parties. *Day & Zimmermann*, 38 Fed.Cl. at 610 (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842–43 (D.C.Cir.1977)).

B. *Analysis*

(1) *Irreparable Injury:* The plaintiff has shown that if a permanent injunction does not issue and the contract award to LLA is sustained, it would be irreparably injured in the form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom. *Day & Zimmermann*, 38 Fed.Cl. at 610 (citing *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 73 (1989)).

(2) *Public Interest:* Though only stated in a footnote, an observation by the plaintiff is worth brief mention here: "[W]hen analyzing the reasonableness of the Navy's conduct[,] [note that] the Navy's elimination of Metcalf creates a situation where the Navy *avoids* a [...] premium associated with contracting with a HUBZone contractor." Pl.Mem. at 22, n. 11 (emphasis added). That is to say, by awarding the contract to anyone other than plaintiff, defendant saves [...]. Without making any firm accusations against the Navy, the mere inference of the foregoing motive in the evaluation process impacting the rationale of an agency is troubling. This is particularly true here, where Congress has deemed it fitting and appropriate to make special provisions in support of HUBZone contractors, an agency must be mindful not to work contrary to the goals of Congress and the Government.

Having said that, plaintiff has shown that granting a permanent injunction will serve the public interest by insuring that the solicitation is conducted in accordance with all federal procurement laws. Undoubtedly, the Navy's violations found herein have the adverse effect of undermining the integrity of the entire federal procurement process. In granting plaintiff's prayed for relief, public confidence and competition in the federal procurement process will be preserved. *Day & Zimmermann*, 38 Fed.Cl. at 610 (citing *PCI/RCI v. United States*, 36 Fed.Cl. 761, 776 (1996)).

(3) *Harm Suffered by Plaintiff Outweighs Harm to Government and Third Parties:* Harm to the Navy, if any at all, will be minimal since the solicitation will only be amended, and not voided, upon grant of injunction. Furthermore, upon re-evaluation consistent with the court's findings herein, the same three bidders will be under consideration respecting offers with which the defendant already has a background. As for the intervenor, LLA, if it truly does offer the Navy the best value, then it will ultimately prevail. Until such time, since a Notice to Proceed has not been issued, neither the

Navy nor LLA should suffer any significant harm from the injunction.

## CONCLUSION

The court finds on each of the six counts as follows:

(I) Section 1A.7 is *patently* ambiguous rendering the solicitation defective. Plaintiff's duty to inquire was negated by defendant's duty, on this record, to notify, the failure of which prejudiced the plaintiff. The Navy, thereby, failed to act in accordance with law/regulation.

(II) The bidders were treated unequally, thus unfairly, when one bidder received *unequivocal* clarification regarding the "budget ceilings" and the other bidders did not, constituting arbitrariness and acts by defendant not in accordance with law/regulation.

(III) Although the Navy improperly evaluated plaintiff's overall rating for Factor C: Small Business Utilization due to its "NR" rating in subfactor 1, the result was harmless error.

(IV) The Navy acted arbitrarily when it ranked plaintiff third technically, as said ranking is not supported in the record.

(V) The Navy acted arbitrarily, and otherwise not in accordance with law/regulation, when it eliminated Metcalf for exceeding a line-item budget ceiling, but did not eliminate another bidder who had previously committed the identical error.

(VI) The Navy properly applied the 10% HUBZone preference for price evaluations, in accordance with law.

Based upon the foregoing, the court hereby:

(1) GRANTS plaintiff's motion for summary judgment on the administrative record as to Counts I, II, IV and V, and DENIES plaintiff's motion as to Counts III and VI;

(2) DENIES defendant's motion for judgment on the administrative record as to Counts I, II, IV and V, and GRANTS defendant's motion as to Counts III and VI;

(3) GRANTS plaintiff's motion for permanent injunction and declaratory judgment as follows:

(i) The court hereby declares that the Navy's contract awarded to Lend Lease Actus under Solicitation No. N624742–00–R–1345 is null and void, and is hereby cancelled, enjoined and set aside;

(ii) The Navy, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting subject procurement, be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from proceeding with performance under Solicitation No. N624742–00–R–1345 unlawfully awarded to Lend Lease Actus for the design and construction of military housing at the Marine Corps Base in Kaneohe Bay, Hawaii, unless and until such time as additional discussions are held with Metcalf, as well as the other offerors, pursuant to applicable laws and regulations; and all best and final offers ("BAFOs") are again received hereinafter and are fully and fairly evaluated;

(iii) Lend Lease Actus, its subsidiaries, agents and assigns be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from executing, receiving, and performing on any contract under Solicitation No. N624742–00–R–1345, unless and until such time as additional discussions are held with Metcalf, as well as the other offerors, pursuant to applicable laws and regulations; and all BAFOs are received and fully and fairly evaluated; and unless and until it is determined to be the new awardee, and

(iv) The Navy is hereby ordered to reinstate Metcalf in the competitive range under Solicitation No. N624742–00–R–1345, and amend subject Solicitation to clarify the application of Section 1A.7, and to have all offerors re-submit final revised proposals, *i.e.*, BAFOs, for re-evaluation consistent with the court's findings herein;

(4) AWARDS plaintiff its costs.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**